IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRANDON WILLIAMSON,

    Plaintiff,

v.                                                                                    Civil Action No. 3:13-cv-704-JAG

BON SECOURS RICHMOND HEALTH
SYSTEM, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on the defendant's motion for summary judgment. (Dk. No. 33.) The plaintiff, Brandon Williams, alleges that his former employer, Bon Secours, fired him because he suffered from post-traumatic stress disorder related to his military service, in violation of both the Americans with Disability Act and the Uniformed Services Employment and Reemployment Rights Act. The record, however, provides no evidence to dispute Bon Secours' justification for terminating Williamson: that the veteran made repeated terroristic threats against the lives of his supervisors, requiring his immediate firing to protect employees and patients. Accordingly, the Court GRANTS Bon Secours' motion for summary judgment.

### I. Material Facts

Williamson is a United States Army veteran who suffers from post-traumatic stress disorder (PTSD) and traumatic brain injury. In August 2011, Williamson applied for an x-ray technician position with Bon Secours Richmond Health System, Inc., and began work there on an

"as needed" basis. (Compl. ¶ 16.)[1] In November 2011, Williamson applied for a full-time x-ray technician position at St. Francis Family Medicine Center, a Bon Secours subsidiary. (*Id.*) St. Francis hired Williamson, who began working there in February 2012. In response to Williamson's struggle with absences and tardiness, his supervisors gave him a written warning during a June 5, 2012 disciplinary meeting. (Pl.'s Opp'n 2.) During that meeting, Williamson told his supervisors that he suffered from PTSD. (Def.'s Supp. 6.)

In July 2012, St. Francis changed Williamson's work schedule from a consistent, full-time schedule to one that changed every two weeks. (*Id.* at 8.) On September 10, 2012, Williamson emailed Paul Junod, the Administrative Director of Bon Secours Human Resources, explaining that the inconsistent schedule had affected his mental health. (*Id.*) In response, Junod asked for a doctor's note outlining how exactly to schedule Williamson's work. (*Id.*) On October 23, 2012, Williamson faxed a note from his doctor to Junod. (Pl.'s Opp'n 5, at ¶ 19.) The note stated that Williamson was receiving treatment for PTSD and traumatic brain injury, and that, while he could work full time, he would benefit significantly from a routine daily schedule. (*Id.* at Ex. 11.) Junod and Williamson then tried to set up a meeting to discuss his work, but scheduling problems kept them from meeting immediately.

Before Junod and Williamson could meet, two nurses at St. Francis, Christina Sykes and June Rice, met with the practice supervisor, Sarah Townshend, to report that Williamson had made several threatening statements about the practice and his supervisors. Rice reported that Williamson had told her that (1) he "wanted to kill Maureen [Paisley] because she talked to [him] mean earlier in the week," and that (2) he "felt like killing Dr. [Jeffrey] Roberts," another of Williamson's supervisors, for a "nasty look" Roberts had given him. (Def.'s Supp. 10, at ¶ 25.)

---

[1] Williamson's application for the position at Bon Secours disclosed his military service. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Supp.") 4.)

2

Sykes reported that Williamson had made similar threats about Dr. Roberts and Paisley to her ("you know what you do to your enemies . . . you kill them"), and that he had also told her that "this Saturday he was going on top of a tall building," explaining, "how else are you going to kill people?" (*Id.*)

Townshend relayed this information to Dr. Roberts and Paisley. (*Id.* at 11, ¶ 29.) Paisley, in turn, told Williamson's other supervisor, Shredl, and alerted Junod to those threats. (*Id.* at 12, ¶¶ 30-31.) After speaking with Paisley, Junod called Williamson, explained the reports, and told him that he would be suspended pending an investigation. (*Id.* at ¶ 32.) Williamson denied making any threats. (*Id.*)

Between November 2 and November 5, 2012, Junod collected written statements from nurses Sykes and Rice, as well as two other employees, Julissa Carey and Beverly Rice, who had also reported hearing Williamson make threatening statements in the practice. The written statements confirmed what Junod had previously learned.

Sykes reported that three weeks earlier, Williamson entered her office and told her that Dr. Roberts looked at him "like the insurgents did in Iraq, and you know what happens to them!" (Def.'s Supp., Ex. 3.) When Sykes asked him to elaborate, Williamson told her, "I killed them." (*Id.*) On another occasion, Williamson told her that "Maureen [Paisley] wrote him up for being late and you know what you do to your enemies." (*Id.*) When Sykes again asked "what?" Williamson explained, "You kill them." (*Id.*) Sykes also wrote that on a third occasion, Williamson told her that "this Saturday he was going on top of a tall building." (*Id.*) When Sykes asked, "Why a tall building?" Williamson replied, "How else are you going to kill people?" (*Id.*)

June Rice wrote that two weeks earlier, Williamson told her that "Dr. Roberts had given him a nasty look earlier that day and it reminded him of the way one of his enemies in the Military had looked at him and he had to kill him." (Def.'s Supp., Ex. 4.) Williamson "then proceeded to

3

say that he felt like killing Dr. Roberts for the way that he glared at him." (*Id.*) Rice also stated that on the evening of November 1, 2012, Williamson told her, "I wanted to kill Maureen because she talked to me mean earlier in the week." (*Id.*) During another encounter, Rice wrote, Williamson told her of a good "dream" he had about her, wherein " . . . You [June Rice] were the only one who survived after our building blew up." (*Id.*) When asked *who* blew up the building, Williamson told Rice, "I did." (*Id.*) Rice also wrote that Williamson was "constantly talking about guns and explosives," and that "anyone he dislikes, disagrees with him or chastises him is the enemy." (*Id.*)

Julissa Carey reported that Williamson "showed [her] new weapons he has [sic] purchased *within the last two weeks*." (Def.'s Supp., Ex. 5.) (emphasis added). Carey also stated that Williamson told her "that he will hurt and kill some of the people in government positions," and that he "advised he made a treat [sic] to harm his last superior in the Army." (*Id.*)

Beverly Rice wrote that on one occasion, "Mr. Williamson spoke to me about threating [sic] his Veteran's hospital therapist and said he could harm her if he wanted too [sic]." (Def.'s Supp., Ex. 6.) Rice also wrote that on another occasion, Williamson approached the front check-in desk and told the employees there, "You guys can drink your own urine." (*Id.*) When told that those employees didn't want to hear that, "he continued to say it over." (*Id.*)

After Junod received the four written statements, he discussed them with Shredl, as well as Bon Secours' Vice President for Human Resources and Bon Secours' in-house counsel. (Pl.'s Opp'n 21-22; Def.'s Supp. 15.) Junod concluded that Williamson was a threat to the safety of Bon Secours' patients and employees and decided to terminate him, explaining that:

> the fundamental way that I do my job, one of the ways I make the decision is patient safety and then employee safety. Those are the first two things I look at. And so when I was brought those statements and brought that, you know, when those came to my attention, I thought employee safety, and made a decision.

(Def.'s Supp., Ex. H, at 145.)[2] Williamson's military service, Junod testified, had no effect on Junod's decision to fire him: "in the normal course of business, if an employee were to make the threats that were made that were reported to me and to management, the decision would have been the same regardless of that [military service]." (*Id.* at 168.)

On November 5, 2012, Junod notified Williamson of his termination. (*Id.* at 16.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment, Williamson (as the non-moving party) may not rest upon conclusory allegations, the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact but, instead, must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. DISCUSSION

Williamson asserts three claims against Bon Secours, each reliant on the sum total of Williamson's factual assertions: (1) a "failure to accommodate" claim under the ADA; (2) a "discrimination" claim, also under the ADA; and (3) a "discrimination" claim brought under USERRA. The Court, as discussed more fully below, must dismiss each. First, Bon Secours responded appropriately under its ADA obligations when Williamson first requested a reasonable (work scheduling) accommodation for his PTSD. Second, Williamson cannot show that Bon Secours' stated reason for terminating Williamson was pretext for an actual, discriminatory

---

[2] Bon Secours put additional security measures in place after learning of Williamson's threats, including hiring an off-duty police officer to guard the entrance to St. Francis, changing the locks for the practice, and installing surveillance cameras at all entrances. (*Id.*)

motive. Finally, there is absolutely *no* evidence that Bon Secours based its decision to fire Williamson—in any part—on his past military service.

## A. Failure to Accommodate Claim (ADA)

Williamson's claim that Bon Secours failed to provide a reasonable accommodation to remedy his PTSD-driven disability requires him to show: "(1) [he] was an individual with a disability within the meaning of the ADA; (2) the employer had notice of [his] disability; (3) with reasonable accommodation, [he] could perform the essential functions of the position; and (4) the employer refused to make such accommodations." *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001)). Williamson alleges facts sufficient to satisfy elements (1), (2), and (3). Williamson's claim hinges, then, on the final element: whether Bon Secours "refused to make" a reasonable accommodation for Williamson.

Williamson argues that Bon Secours did so by breaching its obligation to participate fully and promptly in the ADA-mandated "interactive process" between employer and employee by (1) delaying that process by requesting a doctor's note, and (2) terminating his employment rather than accommodate his disability.[3] Neither argument succeeds.

### *1. Request for Doctor's Note*

The ADA—as detailed in regulations and the Department of Justice's advice to employers—acknowledges the necessity of a genuine give-and-take between an employee seeking a change to the employer's procedures or practices and an employer who must balance the

---

[3] *See Haneke*, at 400 (citing 29 C.F.R. § 1630.2(o)(3)) ("Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation.").

6

particular needs of *that* employee with its business model and other, less-needy employees.[4] "All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999).

Once the employee has made a discernible request for accommodation—as Williamson did in his September 10 email to Junod—the burden shifts to the employer to "request additional information that the employer believes it needs." *Id.* Bon Secours did just that, promptly replying to Williamson's request by asking him to provide a doctor's note outlining exactly how his schedule should change. That action, far from constituting a breach of Bon Secours' duty to operate in good faith, falls squarely in line with the ADA's expectations for employers:

> If an applicant or employee requests an accommodation and *the need for the accommodation is not obvious* . . . the employer may request documentation of the individual's functional limitations to support the request. For example: An employer may ask for written documentation from a doctor, psychologist . . . or other professional with knowledge of the person's functional limitations. . .[5]

PTSD is a psychological disturbance that manifests in vastly different forms, along a broad spectrum of relative intensity.[6] Bon Secours, upon receipt of Williamson's request, knew only that: (1) Williamson had self-reported PTSD, and (2) his current schedule somehow aggravated his condition. Understandably, Junod requested medical guidance specific to his psychological needs. The ADA encourages such action; the courts applaud it: "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, *request information about the condition and what limitations the*

---

[4] *See, e.g.*, 29 C.F.R. §§ 1630.1—16; EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, October 17, 2001 (www.eeoc.gov/policy/docs/accommodation.html).

[5] Technical Assistance Manual: Title I of the ADA, Section 3.6 (http://askjan.org/links/ADAtam1.html#III).

[6] *See Post-Traumatic Stress Disorder (PTSD)*, National Institute of Mental Health, http://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml (last visited July 3, 2014).

*employee has . . .*" *Taylor*, at 317 (emphasis added). Junod's request for a doctor's note did not violate the ADA.

### 2. Termination

The ADA does not protect employees who make terroristic threats against the lives of their fellow employees—even if those threats are the unfortunate byproduct of the employee's disabling mental illness.[7] Williamson provides no evidence that Junod made the decision to fire him on any basis other than the alleged threats to kill his supervisors, blow up the practice, and shoot civilians from a "tall building." "The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct . . . the ADA does not require an employer to ignore such egregious misconduct by one of its employees." *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999). Because Bon Secours acted permissibly in the face of Williamson's apparently repeated and violent threats, its decision to fire him does not provide the grounds for a viable ADA failure to accommodate claim.

### B. Discrimination Claim (ADA)

Williamson alleges that Bon Secours' discriminated against him by firing him because of his PTSD, in violation of § 12112(a) of the ADA. Williamson cannot provide evidence demonstrating that Bon Secours' proffered explanation for its decision to fire Williamson—namely, that it believed that he had threatened the lives of his co-workers, causing no small amount of workplace concern—was pretext, and so Count 2 fails.

In order to prevail on his unlawful discrimination claim, Williamson must show that he: (1) had a qualifying "disability;" (2) was "qualified" for his job; and (3) Bon Secours' termination of

---

[7] *See Palmer v. Circuit Court of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (collecting cases from five Circuit Courts of Appeal) ("The Act does not require an employer to retain a potentially violent employee . . . The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.").

8

was driven by discriminatory intent (re: Williamson's PTSD).[8] *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 212 (4th Cir. 1994). Bon Secours dispute the first two elements, leaving only the issue discriminatory intent for his termination.

### 1. *McDonnell-Douglas framework applies*

An ADA plaintiff can establish intent to discriminate by (1) providing direct or circumstantial evidence of the defendant's discriminatory motivation, or (2) establishing a prima facie case of discrimination and subsequently proving that the defendant's proffered rationale for the adverse employment decision in question "is actually a pretext for discrimination." *Hill*, 354 F.3d at 284-285.

Williamson does not provide evidence—direct or circumstantial—demonstrating that the ultimate decision-maker in his case, Paul Junod, made the decision to fire him based on anything other than genuine concern for the safety of Bon Secours' patients and staff, prompted by Junod's receipt and review of several oral and written reports of Williamson's threatening statements. Accordingly, Williamson must follow the burden-shifting framework of *McDonnell-Douglas*.[9]

That multi-tiered process requires Williamson to first establish a *prima facie* case of unlawful discrimination by "proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis*, 53 F.3d at 58. Williamson must prove, by a preponderance of the evidence, that "(1) [he] was in the protected class; (2) [he] was discharged; (3) at the time of the discharge, [he] was performing [his] job at a level that met [his]

---

[8] Critically, the "ultimate question" in this case concerns whether the *actual decision-maker*—here, Junod—both considered Williamson's PTSD and allowed that disability to play a "determinative influence" in reaching his eventual decision to fire Williamson. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (internal citations omitted). This focus applies, and controls, "regardless of the type of evidence offered by a plaintiff as support for [his] discrimination claim (direct, circumstantial, or evidence of pretext)." *Id.*

[9] *See Ennis v. Nat'l Ass'n of Bus. And Educ. Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995).

9

employer's legitimate expectations; and (4) [his] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Id.*

When deciding Bon Secours' motion for summary judgment, the Court must resolve all genuine factual disputes and inferences in favor of the non-moving party—here, Williamson. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). Accordingly, the Court accepts Williamson's claim that he did *not* make the statements at issue, and proceeds on the assumption that the employees who reported those statements to Paul Junod did so knowing that they were false.

Viewed in this positive light, Williamson can establish his prima facie case. Bon Secours does not dispute that Williamson was (1) in the protected class and (2) discharged. Williamson has provided evidence that his job performance (again, in the assumed absence of those threats) met Bon Secours' expectations, satisfying element (3).[10] Finally, the proximity of Williamson's termination to his request for a reasonable accommodation for his PTSD suffices to raise a "reasonable inference" that the request triggered the termination. *Diebold, supra.*

Accordingly, the burden shifts to Bon Secours "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. Bon Secours' burden is one of production, not persuasion: the Court need not be convinced of the *veracity* of Bon Secours' proffered rationale, only that it suffices as a permissible explanation.[11] Upon proffer of such an explanation, "the presumption created by the *prima facie* case drops out of the picture, and the plaintiff bears the ultimate burden of proving that [he] has been the victim of intentional discrimination." *Ennis*, 53 F.3d at 58 (internal quotation marks omitted).

---

[10] Williamson received his last evaluation on September 28, 2012, a month before his firing.
[11] In other words, Bon Secours must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

Bon Secours has produced direct evidence to support its permissible rationale for terminating Williamson: (1) the testimony of the decision-maker, Paul Junod, as to how and why he reached his decision, and (2) the written statements Junod relied upon.

### 2. *Failure to Demonstrate Pretext*

Saddled now with the burden of persuasion, Williamson could succeed by either (1) proving that Bon Secours was more likely motivated by a discriminatory reason than the hospital's proffered explanation, or (2) showing that Bon Secours' explanation "is unworthy of credence." *Burdine*, 450 U.S. at 256. Williamson can do neither.

Williamson argues that Bon Secours' actual motivation concerned Williamson's PTSD and his related request for accommodation. Allegations unsupported by factual proof, however, cannot survive a motion for summary judgment. Williamson has not disputed that Paul Junod was the ultimate, *actual* decision-maker with regard to his termination; has not disputed Junod's testimony that he relied on the four written statements described above; and has not produced evidence to demonstrate that Junod did *not actually believe* the reliability and veracity of those written accounts. Williamson has not produced a shred of evidence to disprove Junod's sworn testimony that his PTSD played no part in his decision.

Williamson's argument, instead, amounts to two collateral attacks: (1) that Bon Secours' investigation was flawed and inadequate, and (2) that the supervisors and fellow employees are not credible witnesses. First, pointing to flaws in Bon Secours' investigation, however, does "not help [Williamson] establish that the reasons given for [his] termination were not the actual reasons." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011). Second, the credibility of witnesses (and the alleged bias of *non*-decision-makers) does not detract from the central issue

Case 3:13-cv-00704-JAG Document 57 Filed 07/28/14 Page 12 of 14 PageID# 1416

before the Court: the credibility of the *decision-maker*'s stated rationale.[12] "Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, *but for the person who in reality makes the decision.*" *Hill*, 354 F.3d at 291 (emphasis added). Williamson does not dispute Junod's credibility, and the Court finds no reason to do so. Williamson cannot carry his burden of persuasion; Count 2 fails.

### C. **Discrimination Claim (USERRA)**

Williamson's third and final claim asserts that Bon Secours terminated his employment because of his military service, in violation of USERRA. Because Williamson produces no evidence to support this allegation, the Court will dismiss the claim.

In order to prevail on a USERRA claim, "there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001). A plaintiff can use direct or circumstantial evidence in order to make the initial showing that would then shift the burden of proof to the employer. *See FPC Holdings v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995).

Williamson's claim fails at the first hurdle. He does not present any evidence—direct or circumstantial—to show that Bon Secours' decision to fire him was in any way connected to his military service.[13] Williamson's allegation that Bon Secours' decision had such an insidious

---

[12] Williamson's attacks on the credibility of witnesses and the extent of Bon Secours' investigation constitute the type of "minor discrepancies" that are "wholly irrelevant" to the validity of Bon Secours' proffered explanation. *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006).

[13] While the Court need not reach the issue of whether Bon Secours could show "by a preponderance of the evidence" that Williamson would have been fired despite his protected status, Bon Secours has produced more than enough—uncontroverted—evidence to prevail. Specifically, the ultimate decision-maker, Junod, testified that "in the normal course of business, if

12

motivation relies on two facts: (1) Bon Secours knew of his military service, and his service-related PTSD, before it fired him, and (2) several of the written employee statements that Junod considered in reaching his decision mentioned Williamson's past military service.

The first factor cuts *against* Williamson. Bon Secours knew of Williamson's military service *before it hired him*—twice.[14] As relates to his PTSD, Williamson insists that his supervisors knew of his condition "in April or May of 2012." (Pl.'s Opp'n 3, at ¶¶ 8-10.) Bon Secours' immediate response, by Williamson's own account, was one of proactive, solicitous accommodation: Williamson's supervisors called a meeting and "asked Williamson whether he needed any accommodations in his job related to his PTSD." (Compl. at ¶¶ 21-22.) Bon Secours' subsequent response when presented with ample opportunity to fire or suspend Williamson similarly belies his claim. Despite its alleged hostility towards his military service and PTSD, the hospital did *not* fire or suspend Williamson when, in June 2012, his supervisors merely wrote Williamson up twice for what he candidly acknowledges was a "struggle[] with absences and tardies." (*Id.* at 2, ¶ 3.) Later, in October 2012, Bon Secours—knowing full well that Williamson had both PTSD and a now-documented history of absences and late arrivals—"commended Mr. Williamson with a good performance review." (*Id.*) A month *after* requesting a reasonable accommodation—the incident which he claims triggered Bon Secours' discriminatory actions—Williamson lauded his supervisors' willingness to help him, and described his employment atmosphere as "great."[15]

---

an employee were to make the threats that were reported to me and to management, *the decision would have been made the same regardless of that military service*." (Junod Dep. at 168: 14-19.) (emphasis added). Nothing Williamson proffers undermines the credibility of Junod's statement.

[14] An employer's *knowledge* of a plaintiff's service, without more, cannot establish a USERRA discrimination claim. *See Young v. Dep't of Army*, 115 F. App'x 63, 65 (Fed. Cir. 2004).

[15] In an email to Junod (dated October 22, 2012), Williamson stated, "My bosses have been great lately and my working environment has improved in regards to that." (Pl.'s Opp'n, Ex. 11.)

Williamson's second basis for his allegation that Bon Secours harbored an anti-military bias—that the statements considered by Bon Secours' human resources director mentioned Williamson's military service—is equally baseless. The reports Junod read showed an unhinged employee deliberately couching his threats in a military context: because Dr. Roberts looked at Williamson "like the insurgents did in Iraq," one such statement reads, Dr. Roberts would suffer the same violent fate at Williamson's hands. It is perverse and illogical to argue that placing death threats within a military context provides—under *any* law—corresponding immunity from sanction. USERRA is intended to safeguard a service member's job while that service member serves his country. Williamson's claim, however, would treat that well-intentioned law as a "get-out-of-jail-free" card, absolving any misconduct that refers to or touches past military service.

Accordingly, Williamson does not even approach the requisite "initial showing" that his military service motivated or influenced Bon Secours' decision to fire him.

## IV. CONCLUSION

For the reasons above, the Court GRANTS the defendant's motion for summary judgment. The Court shall enter an appropriate order.

Date: July 28, 2014
Richmond, VA

/s/ *signature*
John A. Gibney, Jr.
United States District Judge